[Crim. No. 214. Fourth Appellate District.—September 22, 1931.]

THE PEOPLE, Respondent, v. FRANK ROBERTSON, Appellant.

Earl D. Killion for Appellant.

U. S. Webb, Attorney-General, Alberta Belford, Deputy Attorney-General, Elmer Healde, District Attorney, and H. D. Wolford, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendant was accused, in an information filed by the district attorney of Imperial County, of the crime of "Grand Theft, in that on or about the 1st day of November, 1930, in the County of Imperial, State of California, the said Frank Robertson unlawfully took the property of one J. C. Poe, consisting of nine hundred domestic fowls of the value of $1125.00." He was tried by the court sitting without a jury, found guilty and sentenced to imprisonment in the penitentiary. This appeal is from the judgment and from an order denying a new trial.

It appears from the evidence that about the middle of October, 1930, Paul Robertson, a brother of the appellant, was engaged in the business of buying and shipping chickens in the city of North Hollywood and the appellant, as agent for his brother, was engaged in buying chickens in Imperial County. Taking the evidence most favorable to the respondent, it appears that on October 15, 1930, the appellant, as the agent of his brother, entered into a contract with the complaining witness, J. C. Poe, wherein he agreed to purchase from Mr. Poe 2,000 chickens, with the privilege of culling 200, making a net of 1800 chickens at 85 cents

per head. The appellant had authority to sign checks on his brother's bank account to cover the purchase of chickens in Imperial County, and at the time of this purchase he gave such a check to Poe for $300 on account of the purchase price, agreeing to take delivery of the chickens within a few days. Some ten days later, the chickens not yet having been delivered, Poe went to the home of the appellant in El Centro and received an additional payment of $200 on the deal. On or about October 25, 1930, the appellant went to Poe's ranch for the purpose of taking delivery of part of the chickens. While there is a sharp conflict in the testimony as to what occurred on this occasion, Poe testified that the appellant desired to change the deal and take the best half of the chickens at 95 cents a head, which he refused. No chickens were taken on that day. On November 1, 1930, the appellant returned to Poe's ranch, stated that he had come after the chickens, that he desired to take the larger ones first and that he would come after the others in a few days. Poe agreed to this provided the feed bill would be paid and assisted the appellant in loading 900 of the chickens. Appellant then gave Poe a check on his brother's bank account for $628, this being for 900 chickens at 85 cents, less $200, the second payment theretofore made, plus $63 for cost of feed. It further appears that on November 3, 1930, another employee of P. E. Robertson arrived in North Hollywood with another load of chickens. This employee having told him about the Poe deal, P. E. Robertson called the appellant on the telephone and asked what the facts were. During this conversation P. E. Robertson told the appellant that he intended to see his attorney about stopping payment on this $628 check inasmuch as Poe had not lived up to his contract, and told his brother to come to Los Angeles. After consulting his attorney, P. E. Robertson stopped payment on the check and at the same time issued another check payable to Poe for $278. On the same day, on his instructions, his attorney sent this check to Poe with a letter explaining that since Poe had breached his agreement to sell them 3,000 chickens, they had decided to pay him for 900 chickens actually delivered, instead of holding him to the contract, and that this check, together with the $500 already paid, would cover the 900 chickens delivered at 85 cents each, plus $13 for feed. On November

5th or November 6th, appellant went to North Hollywood and at that time was told by his brother that payment on the check had been stopped. It was stipulated at the trial that payment on the check was stopped by the brother and not by appellant, and that this was not done in appellant's presence.

Respondent argues that the appellant, in obtaining possession of the best 900 chickens at 85 cents per head, was guilty of grand theft, it being contended that the only question at issue is whether or not at the time of taking the chickens there existed in the mind of the appellant an intention to feloniously take the same. While conceding that the fact that the chickens were paid for at 85 cents per head is some evidence that the appellant did not intend to steal them, it is argued that this is not conclusive upon that point. Respondent argues: ''It is clear that whether or not defendant is guilty of grand theft, depends on whether or not there existed in his mind at the time he gave the check for $628 any intention to cancel payment on the check and thereby deprive the defendant of his property. It is true that defendant himself did not stop payment on the check, that this was done by his brother, on whom the check is drawn. But if defendant knew that his brother had such an intent, or if the defendant intended to advise his brother to adopt this means of obtaining the chickens, the offense is grand theft.'' Respondent then points out, as direct evidence of an intent to stop payment of the check, the testimony of one Mrs. Meredith, who testified that some two weeks after the chickens were delivered, the appellant came to a feed store operated by herself and her husband, and then told her that he intended to stop payment on the check when he gave it. While Mrs. Meredith made that statement on cross-examination, her direct testimony was that the appellant came into her place of business and desired to talk to her husband about the check he had given to Poe; that he stated that he knew that Mr. Meredith was going to get a check from Poe and he wanted him to get Poe's personal check and not take the check he had given to Poe, because he knew he was going to stop payment on that check. He further stated that he did not want the Merediths' affairs tied up, because he was going to stop payment on the other check. This is the only evidence shown by the record tend-

ing to show an intent on the part of the appellant to stop payment on the check at the time it was given, and in view of the purpose for which appellant came to the Merediths, and of the fact that Mr. Meredith was present when the check was given, it hardly seems conclusive. In any event, as conceded by respondent, even if the intent to stop payment on the check existed at the time it was given, it was incumbent upon the prosecution to show that some act on the part of the appellant followed that intent. While arguing that if appellant knew that his brother had such an intent, or if he intended to advise his brother to adopt this means of obtaining the chickens, the offense would be grand theft, respondent fails to point to any evidence of those material things in the record. We can find no evidence whatever that appellant then knew of any intention on the part of his brother to stop payment on the check, that he intended to advise his brother so to do, that he ever did advise his brother to do so, or that he did any act or thing thereafter which led to payment being stopped. The uncontradicted evidence is that his brother told him three days later that he intended to consult his attorney for the purpose of seeing if he could not stop payment on the check, and that appellant first learned that payment had been stopped some five or six days later, when he was told this fact by his brother.

It fully appears that the chickens taken were paid for at the contract price, and the fact that certain other chickens were not taken in accordance with the contract, while constituting a breach thereof, neither necessarily makes the taking a theft, nor establishes it as a grand theft. The appellant was charged with stealing 900 chickens of the value of $1125. Under any circumstances, if any theft was committed, it was not that of the entire chickens but was the taking of the excess of the value of these particular chickens over the average contract price. There is no evidence as to what this excess was, except a statement by the complaining witness that the market value in the Imperial Valley, of the chickens taken was $1.25 each. In addition to evidence in the record showing its unreliability, this statement is hardly sufficient to fix the value at the place where the chickens were taken. (*People* v. *Ciani*, 104 Cal. App. 596 [286 Pac. 459].)

Assuming that there is some evidence of intent on the part of the defendant, there is no evidence of any act carrying out the intent and no evidence of the value of the unidentified portion claimed to have been taken. We are well aware that devices of this sort are frequently used to defraud farmers out of their crops and produce, and doubtless this general situation had its influence upon the trial court. The methods used in this transaction are far from commendable. It seems clear that either the defendant or his brother intended to break the contract they had made, and between them they did break it. We may even suspect that one or both of them intended to and perhaps did commit a crime, but upon the record before us certain links in the chain of evidence are missing.

For the reasons given, the judgment is reversed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 6, 1931, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal was denied by the Supreme Court on October 22, 1931.